[Cite as *State v. Jones*, 2011-Ohio-2920.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 95574**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## SAMUEL JONES

DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-535707

**BEFORE:** Jones, J., Blackmon, P.J., and Cooney, J.

**RELEASED AND JOURNALIZED:** June 16, 2011

ATTORNEY FOR APPELLANT

Reuben J. Sheperd
11510 Buckeye Road
Cleveland, Ohio 44104


ATTORNEYS FOR APPELLEE

William D. Mason
Cuyahoga County Prosecutor

BY: Anne McDonough
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, J.:

{¶ 1}  Defendant-appellant, Samuel Jones, appeals his convictions for assault on a police officer, resisting arrest, and falsification.   We affirm.

I.   Procedural History and Facts

{¶ 2}  Jones was indicted on ten counts as follows:   Count 1, aggravated burglary;

Count 2, kidnapping; Count 3, domestic violence; Counts 4 and 5, felonious assault with one- and three-year firearm specifications; Counts 6 and 7, assault on police officers Michael Keane and Daniel Jopek, respectively; Count 8, resisting arrest; Count 9, falsification; and Count 10, having weapons while under disability. Counts 2 and 10, kidnapping and having weapons while under disability, respectively, were dismissed by the state prior to trial.

{¶ 3} The case was tried before a jury. At the conclusion of the state's case, the defense made a Crim.R. 29 motion for acquittal; the motion was denied. The defense presented evidence and renewed its Crim.R. 29 motion at the conclusion of its case; the motion was again denied.

{¶ 4} The jury found Jones guilty of both counts of assault on a police officer, resisting arrest, and falsification. He was found not guilty of the remaining counts and specifications. The trial court sentenced him to a six-month prison term.

A. The State's Case

{¶ 5} Jones and Shannon Graham had a son together, and the son resided with Graham. At the time of the incident, Jones and Graham were not dating, but were on friendly terms. On the evening in question, Graham was at home with a friend, George Granville, and her son.

{¶ 6} Graham testified that she and Granville were asleep in her bedroom when she

was awakened by a noise. Upon investigating, Graham found Jones in her dining room and asked him what he was doing. Jones told Graham that the door to the house was unlocked so he came in. According to Graham, however, she had locked the doors before going to bed that evening. It was undisputed that Jones did not have keys to Graham's house.

{¶ 7} Graham testified that she and Jones exchanged words and then Jones went into the bedroom where he and Granville exchanged words. Graham got in between Jones and Granville, and Jones pushed her out of the way, onto the bed. Granville got his belongings and left the house.

{¶ 8} According to Granville, Jones followed him outside, went to his (Jones's) car, and got a gun that looked like an AK-47 assault rifle. Jones was yelling at Granville that he better not catch him at Graham's house again, and Granville was telling Jones that the incident was over and he was leaving. Granville testified that Jones struck his head with the gun. Jones then walked away and returned to Graham's house. Granville left in his car and called the police to report that a man with a gun was going to Graham's house. Granville went to the hospital a few hours later and received four stitches.

{¶ 9} Jones only stayed at Graham's house for a few minutes and was not there when the police arrived. The police took a short statement from Graham, searched for weapons, and then left in pursuit of Jones. After the police left, Jones returned to Graham's house. He was upset, and Graham was concerned that he was going to hurt himself so she called the

police.    Jones left Graham's house on foot before the police arrived.

{¶ 10} The police encountered Jones on Graham's street and asked to speak with him, but he kept walking.   He had a cell phone up to his ear.   The police commanded Jones to stop, to which Jones responded that he had not done anything wrong.   One of the officers grabbed Jones's arm and asked him his name; Jones responded "George Williams."   The police asked him for identification, but Jones said that he had not done anything wrong and asked the officers to stop bothering him.

{¶ 11} For officer safety, the police then attempted to handcuff Jones, at which time Jones starting "throwing elbows back," hitting the officers, and being physically resistant. The police told Jones that he was under arrest, but Jones refused to comply.   One of the officers took out his taser gun and threatened to use it if Jones did not comply with their orders; Jones still resisted and asked the officers why they were "beating" him.

{¶ 12} The police gave Jones three warnings, and after the third warning, Jones grabbed the taser gun out of the officer's hand.    The officer was able to get the taser back and tasered Jones twice.    Jones still resisted and was able to grab the taser a second time.    The police punched Jones and told him to drop the taser or they would shoot him.   Back-up officers arrived, and Jones surrendered.   The police recovered Jones's identification card during a pat-down search and discovered that he was not George Williams as he had told them.

{¶ 13} One of the officers involved in the arrest, Officer Joseph Litton, was later treated for a contusion under his kneecap and a contusion on the back of his ankle. Officer Michael Keane, who was also involved in the arrest, was elbowed by Jones several times.

{¶ 14} Jones was transported to jail. At jail, Jones attempted to head-butt the officers, and in doing so, one of the officers, Daniel Jopek, got his thumb caught under Jones's chin and tore his muscles. Officer Jopek was treated at the hospital for his injury. The police had to put Jones in a restraint chair and process him at a later time because he was being physically combative.

{¶ 15} Apparently, when the police encountered Jones, he had been placing a call. A small portion of the encounter between Jones and the police was recorded on the other person's voicemail and played for the jury. Jones was heard on the recording asking the police why they were beating him. The officers were heard giving him commands to cooperate. Officer Keane testified that after the officers warned Jones that they would shoot if he did not comply, he heard someone on the other end of the phone pleading with the police not to shoot Jones.

{¶ 16} No weapon was ever recovered.

B.  The Defense's Case

{¶ 17} Jones testified that on the evening in question, as he had often done before, he went to Graham's house with the intention of sleeping there that night so that he could take

their son to school the following morning.   When he arrived at the house, he saw a vehicle parked in the spot where he normally parked.   He left his vehicle running, went up to the house, found the door unlocked, and let himself in.

{¶ 18} Upon entering the house, Jones noticed boots and a sweatshirt that he knew did not belong to Graham, and wondered "what bum is she messing with now."   Jones proceeded to the bedroom where he found Graham and Granville in bed.   He told Granville to go, and Granville got up, pushed Jones, and ran past him out of the bedroom.   When Granville pushed him, Jones fell onto Graham; he got up and told her he was not trying to hurt her.

{¶ 19} Jones then questioned Graham about the man in her room.   He was baffled that Graham was with another man because he and Graham had been trying to work on their relationship and, as recently as a week before the incident, had been to counseling.

{¶ 20} While Jones was trying to talk to Graham, he heard Granville, who was in the living room, make a derogatory comment.   Jones went to the living room to find out why Granville was still there.   The two had a "confrontational" conversation.

{¶ 21} Jones testified that he realized he had left his car running, so he told Granville to stay in the house while he went outside to turn off his car.   Granville came outside, however, and as Jones was turning off his car, Granville grabbed him and attempted to punch him.  Jones then punched Granville.   The two had words, and then Granville got in his vehicle and drove away.   Jones went back inside Graham's house to check on his son.

Jones told Graham that he came into the house because the door was unlocked, and then he left.   He said he felt "hurt" as he left.

{¶ 22} Jones wanted to go back to Graham's house to talk to her about their relationship.   He called her and learned that the police had been called and given his name. He went to her house anyway and parked his car in a nearby schoolyard so that if he got arrested, the car would not be towed.   As he was walking to Graham's house, the police drove past him.   He saw the police go to Graham's door, so he kept walking until they were gone.   When he went to Graham's door, she was sitting on a couch in the living room but would not let him in.   Jones told Graham that he loved her, loved their son, and did not know what was going to happen to him that night; he then left.

{¶ 23} As Jones was walking back to his car, he was trying to call someone to let them know he was probably going to jail when the police drove up to him and told him not to move.   He asked what he did and kept walking.   Jones then heard the officers running toward him so he stopped walking and turned around.   According to Jones, he remained still and was waiting for a command from the officers, but instead, one of the officers hit him in the jaw. The officer then grabbed Jones by his upper torso and tried to throw him to the ground. According to Jones, he was then "beat up by the police," despite his pleas for them to stop. At one point, they tasered him, and he tried to grab the taser gun, but never gained control of it.   They handcuffed him and placed him in a police cruiser. Jones claimed he was struck

again in the face by the police while in the cruiser.

{¶ 24} Jones was later placed in an ambulance to be examined and while in there one of the officers, whom he claimed beat him, came into the ambulance. Jones "flipped out" because he did not know what the officer's intentions were, and he asked him to leave, but the officer did not.

{¶ 25} Jones testified that when the police brought him to jail, he was tired from the beating and just wanted to lie down, but the police "slammed" him into the back portion of the elevator and started beating him again. As part of the beating, one of the officers bent one of his fingers back "as hard as he could."

{¶ 26} The beating continued after they got off the elevator, and included the police slamming Jones on the booking desk, "mashing" his head into the desk, taking his shoes off, and "stomping" on his toes. The officers then restrained Jones in a restraint chair with a "spit" mask, despite the fact that he was not spitting at anyone.

{¶ 27} Jones denied having a weapon and hitting anyone with a weapon. He also denied that he was combative or confrontational. Jones testified that he was the only witness in the case who told the truth.

{¶ 28} Jones assigns two errors for our review, the first challenging the sufficiency of the evidence and the second challenging the weight of the evidence.

II. Law and Analysis

A. Sufficiency of the Evidence

{¶ 29} In his first assignment of error, Jones challenges his convictions for assault on a police officer and resisting arrest on sufficiency of the evidence grounds.

> "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 30} A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541.

1. Assault on a Police Officer

{¶ 31} R.C. 2903.13(A), governing assault, provides in relevant part that "[n]o person shall knowingly cause or attempt to cause physical harm to another." Counts 6 and 7, relating to Officers Keane and Jopek, respectively, contained furthermore clauses that the assaults were committed upon peace officers while in performance of their official duties.

{¶ 32} Jones contends that the state failed to present evidence that Officer Keane suffered any injuries. We disagree. Officer Keane was involved in the initial encounter between Jones and the police near Graham's house. He was the officer who first commanded Jones to stop. After Jones repeatedly ignored the officer's commands, the officer grabbed

Jones by the shoulder; Jones "whipped" the officer's arm off of him. The police got hold of Jones again, and Officer Keane testified as follows about the ensuing events: "So we're still trying to hold his arm, and two, three more times [Jones] just fires that right arm back like real hard * * *. I had his jacket sleeve, and he's just throwing that right elbow back real hard, hits me in the chest, hits me in the shoulder, hits me in the side of the head. My glasses went flying sideways."

{¶ 33} Physical harm is defined under R.C. 2901.01(A)(3) as "any injury, illness or other physiological impairment, regardless of its gravity or duration." The above testimony was sufficient evidence that Keane suffered physical harm because of Jones's actions.

{¶ 34} Jones further contends that the state failed to prove that he acted knowingly in regard to either officers. Rather, Jones contends that it "appears as though it was primarily [his] intent to break free from the officers who were detaining him." We disagree.

{¶ 35} "A person acts knowingly, regardless of his purpose, when he is aware that the conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 36} The record here demonstrates that Jones was upset because Graham had been with another man. Jones testified that before his encounter with the police, he believed he would probably be going to jail. But the state presented testimony that when the police

approached him, he ignored their repeated requests for him to stop and talk to them and initiated the ensuing physical altercation. The state also presented evidence that Jones was highly combative throughout his encounter with the police, including while he was at jail and the police were trying to book him. His combativeness in jail resulted in Officer Jopek's being treated at the hospital for torn muscles in his hand.

{¶ 37} On this record, there was sufficient evidence that Jones acted knowingly. Accordingly, the trial court properly denied Jones's Crim.R. 29 motion as it related to the assault on a police officer counts.

2. Resisting Arrest

{¶ 38} R.C. 2921.33 governs resisting arrest and provides that "[n]o person, recklessly or by force, shall resist or interfere with the arrest of the person or another." Jones contends that the evidence was insufficient to support the resisting arrest conviction because when the police approached him, they "immediately grabbed him without any explanation as to what they were doing or the purpose for their engagement with him." According to Jones, he was "not told that he was being arrested or detained, and therefore he was not aware that he was being arrested."

{¶ 39} The state presented evidence, however, that when the police encountered Jones walking on Graham's street they asked to speak with him, but he kept walking. The officers commanded him to stop, but Jones responded that he had done nothing wrong and continued

walking. Because the police had information that Jones had a weapon, they then attempted to handcuff him for officer safety. Jones immediately began to assault them. The police told him that he was under arrest, but he remained combative, so much so that the police tasered him two times. This evidence, coupled with Jones's own testimony that (1) he ignored the police because he had done nothing wrong and (2) prior to his police encounter, he believed he was going to be arrested, was sufficient evidence that Jones resisted arrest. Accordingly, the trial court properly overruled the Crim.R. 29 motion as it related to resisting arrest.

{¶ 40} In light of the above, the first assignment of error is overruled.

B. Weight of the Evidence

{¶ 41} For his second assigned error, Jones contends that his conviction was against the manifest weight of the evidence.

{¶ 42} A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins* at 387. In determining whether a conviction is against the manifest weight of the evidence, a reviewing court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial is

reserved for only those "exceptional cases in which the evidence weighs heavily against the conviction." Id.

{¶ 43} Jones contends that this case is exceptional because the voicemail recording, on which he is heard asking the officers why they were beating him, demonstrated his account of the events was true, namely, that the police were the aggressors and he was merely trying to defend himself. One of the officers testified, however, that Jones's words were inconsistent with his actions and he believed Jones was aware he was being recorded and therefore made the statements to help at a later time with his defense. Jones contends that the officer's explanation is "completely implausible."

{¶ 44} Jones further contends that the officer's testimony that he heard a voice on the phone plead with the police not to shoot Jones is "impossible" because the incident was being recorded on voicemail. Thus, according to Jones, the officer's testimony was a "clear fabrication" that calls into question the officer's and his partner's testimonies.

{¶ 45} Upon review, this was not an exceptional case in which the evidence weighs heavily against the conviction. All of the state's witnesses testified that Jones was upset and combative. Along with Jones's query to the police why they were beating him, the recording also included the police attempts to settle Jones down and get him to obey their commands. Thus, the recording corroborated all of the state's witnesses' descriptions of Jones's demeanor. Further, the officer did not waiver from his testimony that he heard a voice on the phone,

and testified that it was possible that Jones could have made two separate phone calls.

{¶ 46} Moreover, there were inconsistencies in Jones's testimony. For example, he testified that he went to Graham's house with the intention of sleeping there that night, but left his vehicle running upon arriving there. When he realized his car was running, he told Granville to stay in the house while he went outside to turn it off, despite the fact that he had previously ordered Granville out of the house. Further, Jones testified that when the police approached him, he told them he did not do anything, despite his testimony that after he learned that the police had been called and given his name, he believed he would be arrested.

{¶ 47} Although we consider the credibility of witnesses in a manifest weight exercise, issues of witness credibility and the weight to attach to specific testimony still remain primarily within the province of the trier of fact, whose opportunity to make those assessments is superior to that of the reviewing court. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. On this record, the jury did not "clearly [lose] its way and create[ ] such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *Martin* at 175.

{¶ 48} In light of the above, the second assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES,   JUDGE

PATRICIA A. BLACKMON, P.J., CONCURS;
COLLEEN CONWAY COONEY, J., CONCURS
IN JUDGMENT ONLY